UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Mario Rangel,

        Plaintiff,

v.

Tommy Satele, *Plymouth Police Officer,*
*in his individual and official capacity*, and
City of Plymouth,

        Defendants.

File No. 23-cv-2535 (ECT/SGE)

**OPINION AND ORDER**

---

Nicholas Sweeney, Brazil Sweeney Law Group, Minneapolis, MN, for Plaintiff Mario Rangel.

Ryan M. Zipf, League of Minnesota Cities, St. Paul, MN, for Defendants Tommy Satele and City of Plymouth.

---

This case arises from a traffic stop in very cold weather. In February 2021, Defendant Tommy Satele, an officer with the City of Plymouth Police Department, stopped Plaintiff Mario Rangel. After Mr. Rangel questioned whether the stop was racially-motivated and refused to produce his driver's license and proof of insurance, Officer Satele ordered Mr. Rangel out of the vehicle he was driving, handcuffed him, and forced him to stand outside in wind chills colder than -35ºF. Mr. Rangel suffered frostbite and other injuries. In this case, Mr. Rangel claims through § 1983 that Officer Satele violated his rights under the First, Fourth, Eighth, and Fourteenth Amendments. Mr. Rangel also asserts a negligence claim under Minnesota law. Mr. Rangel claims Defendant City of Plymouth is vicariously liable for Officer Satele's negligence.

Officer Satele and the City of Plymouth seek partial summary judgment, and their motion will be granted. Officer Satele had at least arguable reasonable suspicion to detain Mr. Rangel. His decision to expose Mr. Rangel to the bitterly cold weather violated no clearly established law. And Officer Satele was not deliberately indifferent to Mr. Rangel's medical needs. These conclusions mean that, to the extent he seeks summary judgment against Mr. Rangel's § 1983 claims, Officer Satele possesses qualified immunity. Officer Satele—and by extension the City—also possess official immunity under Minnesota law against Mr. Rangel's negligence claim, but only to the extent the claim concerns Officer Satele's decisions to remove Mr. Rangel from the vehicle and handcuff him. Left for trial, then, are Mr. Rangel's § 1983 claim challenging the constitutionality of the initial traffic stop and Mr. Rangel's negligence claim to the extent it seeks recovery for his cold-weather injuries.

I[1]

*Officer Satele stops Mr. Rangel and runs the vehicle's plate.* In the early morning of February 14, 2021, Mr. Rangel was driving a pick-up northbound on I-494 in Plymouth, Minnesota. ECF No. 26-1 at 7–8. It was very cold. ECF No. 29-4 at 2, 4–5 (showing official local temperature at -14ºF or -15ºF with a windchill between -36ºF and -38ºF). Officer Satele was patrolling the same highway, tasked to look for distracted or drunk drivers. ECF No. 26-1 at 7. Officer Satele, on his account, observed Mr. Rangel vary speeds and swerve outside the lane without signaling. *Id.* at 8; ECF No. 29-7 at

---

[1] Unless noted otherwise, the facts are undisputed or described in a light most favorable to Mr. Rangel. Fed. R. Civ. P. 56(a).

1:32–38.  Mr. Rangel denies he violated any traffic laws.  *Id.* at 1:44–2:02, 7:50–56.
Officer Satele activated his lights and stopped Mr. Rangel.  *Id.* at 1:00–30; ECF No. 26-2
at 117:14–18.  Officer Satele entered the truck's license plate in a system accessible
through his squad car's computer.  ECF No. 26-2 at 91:13–18.  He learned the truck was
registered to a business.  *See* ECF No. 26-1 at 8; ECF No. 26-4 at 9:14–16.

 *Officer Satele asks Mr. Rangel for his driver's license and proof of insurance; Mr.
Rangel questions whether the stop was racially-motivated and does not produce the
requested documents.*  Officer Satele exited his squad and approached the truck.  ECF
No. 29-7 at 1:05–25.  He asked Mr. Rangel for his driver's license and proof of
insurance.  *Id.* at 1:25–30.  Mr. Rangel told Officer Satele that he had both items, but he
refused to give them to Officer Satele, saying, "You're pulling something," and denied he
had swerved or changed his speed.  *Id.* at 1:29–31, 1:50–2:02.  Officer Satele asked for
Mr. Rangel's license and proof of insurance a second time.  *Id.* at 1:54–57.  Officer Satele
advised Mr. Rangel that the roadside was not the place to argue; Mr. Rangel then accused
Officer Satele of racial profiling.  *Id.* at 2:06–27.  Officer Satele requested Mr. Rangel's
license and insurance a third and fourth time, but Mr. Rangel did not hand them over.  *Id.*
at 2:31–41.  He continued to accuse Officer Satele of racial profiling.  *Id.* at 2:32–3:01.
Officer Satele made a fifth request; again, Mr. Rangel did not comply and explained he
did not know what he could be ticketed for.  *Id.* at 3:01–14.  At some point during this
conversation—the video record is not clear—Mr. Rangel picked up and held his license,
but he did not hand it or his insurance card to Officer Satele.  ECF No. 26-4 at 19:12–25.

*Officer Satele orders Mr. Rangel to exit the vehicle and handcuffs him.* After Mr. Rangel refused to comply with the fifth request, Officer Satele ordered Mr. Rangel to exit the truck. ECF No. 29-7 at 3:13–15. Mr. Rangel complied and said he was holding his license. *Id.* 3:30–37. Officer Satele replied, "OK. You were refusing to provide it, so right now you're being detained until I can identify you." *Id.* at 3:37–43. He then handcuffed Mr. Rangel and the two stood together in front of the squad car. *Id.* at 3:40–4:53; *see also* ECF No. 29-2 at 3:53–5:28 (showing Officer Satele holding Mr. Rangel by the arm, handcuffing him, and guiding him out of the truck). Officer Satele explained, "We're going to sit here until I have another person here, and then I'm going to run you and make sure you're valid." ECF No. 29-7 at 5:36–42.

*Officer Satele and Mr. Rangel stand together outside for about five minutes waiting for additional officers to arrive.* The two stood outside for about five minutes. *Id.* at 3:35–8:35; *see* ECF No. 29-4 at 2. Neither Mr. Rangel nor Officer Satele was wearing gloves. ECF No. 29-2 at 3:53–5:28; ECF No. 26-2 at 104:23–24. Officer Satele did not know the exact temperature but knew it was very cold. ECF No. 26-2 at 138:7–14; ECF No. 29-7 at 6:02–05. (Later, while sitting in his squad running Mr. Rangel's license, Officer Satele is recorded saying to himself, "Fucking Christ. It's cold." ECF No. 29-7 at 12:16–20; ECF No. 26-2 at 154:5–13.) Mr. Rangel asked, "Any chance I can get my gloves? It's really cold." ECF No. 29-7 at 5:42–47. Officer Satele refused Mr. Rangel's request and said, "Right now we are sitting right here until we have another person here." *Id.* at 5:45–50. A few seconds later, Mr. Rangel said, "I'm really cold. I mean, if you want to get my gloves . . . I would appreciate it if you get my gloves." *Id.* at

6:02–13.  Officer Satele refused this request, explaining, "I'm not walking away from you. . . . And I would have appreciated if we could have just had this conversation while you were sitting in the driver's seat."  *Id.* at 6:09–19.  About a minute later, Mr. Rangel told Officer Satele, "You know you're well-equipped, jacket and everything, and you know that I'm not."  *Id.* at 06:50–56.  Mr. Rangel noted it was negative -16ºF, and "[Officer Satele] didn't have to" have him out in the cold.  ECF No. 29-7 at 7:08–15. Officer Satele responded, "Yeah, we could have very well had this conversation with you sitting in the car.  You didn't want to identify yourself, so this is how it's going to go." *Id.* at 7:14–23.  Mr. Rangel rejected Officer Satele's characterization, asserting, "My license was in my hand, and I was showing it to you"; Officer Satele responded, "And you were refusing to provide it to me. You were sitting there, accusing me of profiling, and arguing."  *Id.* at 7:22–34.

*While waiting for additional officers to arrive, Mr. Rangel does not display frostbite symptoms.*  Officer Satele received training as a paramedic, including training regarding frostbite.  ECF No. 26-2 at 138:24–139:13.  He did not know how long it took to develop frostbite in those temperatures, but he knew that wind was a factor, and that "the longer you're out there, the higher the likelihood would be."  *Id.* at 139:14–140:24. He knew that one appropriate way to treat a frostbite victim was to "remove him from the cold environment."  *Id.* at 142:8.  Symptoms of frostbite include skin discoloration.  *Id.* at 141:16–23; 146:23–147:5; *see also Frostbite*, Mayo Clinic, https://www.mayoclinic .org/diseases-conditions/frostbite/symptoms-causes/syc-20372656 (last visited Apr. 23, 2025) (listing frostbite symptoms).  The record does not show that Mr. Rangel

5

experienced any skin discoloration, and Officer Satele did not observe Mr. Rangel develop any frostbite symptoms.  ECF No. 26-1 at 9.

*Two additional officers arrive and stand outside with Mr. Rangel while Officer Satele runs Mr. Rangel's license.*  Officers Jacob Groth and Nicholas Lindberg arrived.  ECF No. 26-2 at 149:21–23; ECF No. 29-7 at 8:35; ECF No. 26-1 at 10.  Officer Satele told the other officers, "I just got to ID him.  He wanted to be a no person, so we had to sit out here and do it this way."  ECF No. 29-7 at 8:39–46.  Officer Satele then returned to his squad car to run Mr. Rangel's license.  *Id.* at 8:46–56.  Officers Groth and Lindberg waited outside with Mr. Rangel for about five minutes.  *See id.* at 8:50–14:10.  At one point, Officer Satele lowered the front passenger window of his squad to explain to one of the officers that Mr. Rangel "wouldn't ID himself, was immediately from the get arguing about, this is a profiling, blah blah blah, so pulled him out, stood by till you guys got here."  *Id.* at 9:20–31.  Officer Satele's check of Mr. Rangel's license revealed no warrants.  ECF No. 26-2 at 153:7–13.  While still in his squad, Officer Satele prepared a written warning "for failing to drive within a single lane of traffic" that he would issue to Mr. Rangel.  ECF No. 29-7 at 13:30–14:00 (printing citation in squad car); *id.* at 15:15–24 (explaining citation).

*The stop ends roughly fourteen minutes after it started.*  After verifying Mr. Rangel's identity, determining that Mr. Rangel was not the subject of any outstanding warrants, and preparing the written warning, Officer Satele walked back to Mr. Rangel, removed the handcuffs, returned Mr. Rangel's license and proof of insurance, and handed Mr. Rangel the written warning.  ECF No. 29-7 at 14:07–15:38.  Mr. Rangel continued to

6

protest Officer Satele's justification for the stop for roughly a minute and then returned to the truck to leave. *Id.* at 14:58–15:41.

*Mr. Rangel is diagnosed with frostbite and related health consequences resulting from the stop.*  Mr. Rangel went to urgent care shortly after the stop and was diagnosed with frostbite on his ears and fingers. ECF No. 26-4 at 64:3–10. He also visited a burn specialist twice to receive treatment for his injuries. *Id.* at 64:10–24. Care providers told Mr. Rangel he should be cautious in cold weather and not expose his ears in that environment. *Id.* at 64:25–65:9. His ears and fingers continue to suffer lingering effects—they are more sensitive and hurt in the cold. *Id.* at 65:10–19.

## II

Mr. Rangel asserted six claims in his Complaint, four claims under federal law and two claims under Minnesota law. Mr. Rangel asserted each of his federal claims under § 1983, and he brought each § 1983 claim against Officer Satele "both in his individual and official capacity as a Plymouth police officer." ECF No. 1 ¶ 2 (indicating that Officer Satele is sued in his individual and official capacities); *id.* ¶¶ 32–53 (indicating that Officer Satele is the only defendant named in the federal claims). (1) Mr. Rangel claimed that Officer Satele stopped and seized him without probable cause or reasonable suspicion to believe that Mr. Rangel had violated any law. *Id.* ¶¶ 32–39. For this reason, Mr. Rangel claimed the entire stop (from start to finish) violated the Fourth Amendment. *See id.* ¶¶ 36–37. (2) Mr. Rangel claimed Officer Satele's use of force "when he seized, handcuffed and detained Plaintiff in the severe cold" was excessive, also in violation of the Fourth Amendment. *Id.* ¶¶ 40–42. (3) Mr. Rangel claimed Officer Satele was

deliberately indifferent to Mr. Rangel's "objectively serious medical needs" in violation of the Eighth and Fourteenth Amendments. *Id.* ¶¶ 43–49.  (4) Mr. Rangel claimed that Officer Satele retaliated against Mr. Rangel's exercise of free speech by ordering Mr. Rangel out of the truck, handcuffing him, and detaining him outside in the extreme cold, all in violation of the First Amendment. *Id.* ¶¶ 50–53.  Mr. Rangel asserted his two state-law claims against both Officer Satele and the City of Plymouth. *See id.* ¶¶ 54–65 (indicating that both Defendants are named in each of the state-law claims).  (5) Mr. Rangel claimed that Officer Satele's decision to keep Mr. Rangel outside in the cold amounted to intentional infliction of emotional distress and that the City is vicariously liable for Officer Satele's intentional tort. *Id.* ¶¶ 54–60.  (6) Mr. Rangel claimed Officer Satele acted negligently throughout the stop and that the City is vicariously liable for Officer Satele's negligence. *Id.* ¶¶ 61–65.

For different reasons, not all of Mr. Rangel's six claims are at issue in this motion. The City construed Mr. Rangel's official-capacity claims against Officer Satele as *Monell*[2] claims against it.  ECF No. 24 at 21.  Mr. Rangel did not take issue with this characterization and clarified in his opposition brief that he "is no longer pursuing any *Monell* claims."  ECF No. 28 at 19.  The official-capacity/*Monell* claims, then, are off the table.  Mr. Rangel previously stipulated to the with-prejudice dismissal of his intentional-infliction-of-emotional-distress claim, meaning it too is off the table. *See* ECF Nos. 19–21.  For his part, Officer Satele did not seek summary judgment with respect to all of Mr.

---

[2]     *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

Rangel's remaining claims. Officer Satele did not seek summary judgment against Mr. Rangel's § 1983/Fourth Amendment claim that Officer Satele lacked probable cause or reasonable suspicion to initiate the stop—that is, to pull Mr. Rangel over. ECF No. 24 at 2 n.2. And neither Officer Satele nor the City seek summary judgment against Mr. Rangel's negligence claim to the extent the claim concerns "the cold weather injuries [Mr. Rangel] experienced." *Id.* at 3 n.3. No matter the outcome here, these two claims are headed to trial.

## III

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citation omitted).

## IV

## A

Whether Officer Satele has qualified immunity from Mr. Rangel's § 1983 claims depends on the answers to two questions: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional . . . right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Brown v. City of Golden*

*Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citations omitted); *see also Watson v. Boyd*, 2 F.4th 1106, 1109 (8th Cir. 2021). Courts may consider the questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). A § 1983 plaintiff can defeat a claim of qualified immunity only if the answer to both questions is yes. *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009). "Qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Sok Kong ex rel. Map Kong v. City of Burnsville*, 960 F.3d 985, 991 (8th Cir. 2020) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)), *cert. denied sub nom. Kong v. City of Burnsville*, 141 S. Ct. 2839 (2021) (Mem.). If the material facts are not genuinely disputed, then the constitutionality of an officer's conduct is a question of law. *Thompson v. Reuting*, 968 F.2d 756, 759 (8th Cir. 1992); *see also Pollreis v. Marzolf*, 66 F.4th 726, 732 n.2 (8th Cir. 2023); *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003).

"For purposes of the second prong, [courts] look to 'the legal rules that were clearly established at the time' the action at issue was taken." *Graham v. Barnette*, 5 F.4th 872, 881 (8th Cir. 2021) (quoting *Davis v. Hall*, 375 F.3d 703, 711 (8th Cir. 2004)). "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). While Supreme Court "case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (cleaned up). "This inquiry 'must be undertaken in light of the specific context of the case, not as

a broad general proposition.'" *Rivas-Villegas*, 595 U.S. at 5–6 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).  As the Eighth Circuit has explained, a plaintiff can show that a right was clearly established in different ways:

> [1] [A] plaintiff may point to existing circuit precedent that involves sufficiently "similar facts" to "squarely govern[]" the officer's actions such that the officer had "notice that [his] specific use of force [was] unlawful," *Kisela v. Hughes*, 584 U.S. [100, 104–05] (2018) (per curiam), [2] present "a robust consensus of cases of persuasive authority" doing the same, *see De La Rosa v. White*, 852 F.3d 740, 745 (8th Cir. 2017), or [3] demonstrate that a general constitutional rule applied with "obvious clarity" to the facts at issue, *see Rokusek v. Jansen*, 899 F.3d 544, 548 (8th Cir. 2018).

*Boudoin v. Harsson*, 962 F.3d 1034, 1040 (8th Cir. 2020) (third, fourth, and fifth alterations in original).

## B

### 1

Framed considering the Complaint's allegations, the questions regarding Mr. Rangel's excessive-force claims are whether Officer Satele violated clearly established Fourth Amendment rights when he (a) handcuffed Mr. Rangel[3] and (b) required him to

---

[3]    At times, Mr. Rangel has appeared to claim that Officer Satele used excessive force just by requiring Mr. Rangel to exit the truck.   Without more, an officer does not violate the Fourth Amendment by asking the subject of a traffic stop to step out of the vehicle.  *See Pennsylvania v. Mimms*, 434 U.S. 106, 110–12 (1977).  That is essentially what happened here.  Officer Satele directed Mr. Rangel to exit the truck and held Mr. Rangel's arm as he stepped out and away from the vehicle.  ECF No. 29-2 at 3:53–5:28. This *de minimis* force did not violate the Fourth Amendment.  *See Mimms*, 434 U.S. at 110–12.  Officer Satele's use of more than *de minimis* force began when he handcuffed Mr. Rangel.

stand outside in the severe cold while confirming Mr. Rangel's identity and checking his license. *See* ECF No. 1 ¶¶ 40–42.[4]

The Fourth Amendment protects "the right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "An officer can 'conduct a brief, investigatory stop'—what we call a '*Terry* stop'—'when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *Haynes v. Minnehan*, 14 F.4th 830, 835 (8th Cir. 2021) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)); *see Terry v. Ohio*, 392 U.S. 1, 19–20 (1968). "A lawful *Terry* stop 'may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution.'" *Haynes*, 14 F.4th at 835 (quoting *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011)). Courts in this Circuit analyze whether *Terry* stops violate the Fourth Amendment in two prongs: "(1) whether the investigatory stop is lawful at the outset, and (2) whether the manner in which the stop was conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" *El-Ghazzawy*, 636 F.3d at 457 (quoting *Terry,* 392 U.S. at 19–20).

---

[4]     In Mr. Rangel's view, it is not necessary to analyze these questions separately. He says that, because the initial stop is a jury issue, "everything that happened after the initial illegal seizure" is also a jury issue. ECF No. 28 at 7. This is not correct. Just because an officer's initial stop violated clearly established constitutional rights does not mean that every subsequent action the officer may have taken violated other clearly established rights. *See Garcia v. City of New Hope*, 984 F.3d 655, 663–69 (8th Cir. 2021) (reversing summary judgment to defendant on Fourth Amendment seizure claim but affirming it on Fourth Amendment excessive force claim), *abrogated on other grounds as recognized by Laney v. City of St. Louis*, 56 F.4th 1153, 1157 n.2 (8th Cir. 2023); *Mulbah v. Jansen*, No. 4:20-CV-04127-KES, 2022 WL 823931, at *9, *15 (D.S.D. Mar. 18, 2022) (denying summary judgment to defendant on unlawful seizure claim but granting it on unlawful prolongation claim).

The handcuffing and cold-weather-detention issues here implicate the second *Terry* prong. Several settled rules guide the analysis of this question. "An officer's use of force violates the Fourth Amendment if it was 'objectively unreasonable.'" *Pollreis*, 9 F.4th at 747 (quoting *Graham v. Connor*, 490 U.S. 386, 394–96 (1989)). "Objective unreasonableness is 'judged from the perspective of a reasonable officer on the scene,' in light of 'the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396).

a

"[P]olice officers may reasonably handcuff a suspect in the course of a *Terry* stop to protect officer safety and maintain the status quo." *Irvin v. Richardson*, 20 F.4th 1199, 1206 (8th Cir. 2021). As the Eighth Circuit has explained, however:

> [B]ecause handcuffs constitute "greater than a de minimus [sic] intrusion," their use "requires the [officer] to demonstrate that the facts available to the officer would warrant a man of reasonable caution in [believing] that the action taken was appropriate." [*El-Ghazzawy*, 636 F.3d at 457] (first alteration in original) (quoting *Lundstrom v. Romero*, 616 F.3d 1108, 1122–23 (10th Cir. 2010)). In particular, *Terry* "requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case." *Id.* (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005)). We have already held that handcuffing "absent any concern for safety" violates the second *Terry* prong. *Id.* at 460 (citing *Manzanares v. Higdon*, 575 F.3d 1135, 1150 (10th Cir. 2009)).

13

*Haynes*, 14 F.4th at 835.  "Questions about 'identity are a routine and accepted part of many *Terry* stops[,]'" but it remains the presence of an objective safety concern, not the need to answer identity questions, that is necessary to justify handcuffing.  *Id.* at 835 n.4.  Officers must act with reasonable diligence to "pursue[] a means of investigation that [is] likely to confirm or dispel their suspicions quickly."  *Irvin*, 20 F.4th at 1207 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

The undisputed facts establish that Officer Satele had legitimate reasons to handcuff Mr. Rangel, meaning the handcuffing did not violate the Fourth Amendment's protections against excessive force.  The law permitted Officer Satele to arrest Mr. Rangel, though everyone seems to agree Officer Satele did not go that far.  "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."  *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).  And handcuffing an arrestee is "a routine police procedure."  *Royster v. Nichols*, 698 F.3d 681, 691 (8th Cir. 2012) (quotation omitted).  Here, Mr. Rangel refused to comply with Officer Satele's requests for Mr. Rangel's driver's license and proof of insurance.  In February 2021 (and still today), a motorist's refusals to produce these documents were punishable as misdemeanors under Minnesota law.  Minn. Stat. §§ 171.08, 171.241 (addressing refusal to produce driver's license); Minn. Stat. § 169.791, subdiv. 2(a) (addressing refusal to produce proof of insurance).  Mr. Rangel's refusals to produce these documents gave Officer Satele probable cause to think Mr. Rangel violated these statutes and arrest him, Minn. Stat. § 629.34, subdiv. 1(c)(1) (authorizing peace officer to make a warrantless

arrest "when a public offense has been committed or attempted in the officer's presence"); *see Johnson v. Morris*, 453 N.W.2d 31, 36 (Minn. 1990) ("'Public offense' includes both misdemeanors and felonies, and need not involve a breach of peace." (quoting *Smith v. Hubbard*, 91 N.W.2d 756, 761 (Minn. 1958))); *see also Spottswood v. Washington County*, No. 19-cv-1331 (MJD/ECW), 2022 WL 707202, at *8 (D. Minn. Jan. 20, 2022) (reading section 629.34, subdivision 1(c) to mean that "a party can be arrested even for a misdemeanor when it is committed in the presence of an officer"). As noted, the decision to handcuff Mr. Rangel is typical of arrests. If it would not have violated the Fourth Amendment had Officer Satele arrested Mr. Rangel and handcuffed him incident to the arrest, it is difficult to understand how Officer Satele violated the Fourth Amendment when he took the lesser step of briefly detaining and handcuffing Mr. Rangel. *Cf. Ward v. City of Minneapolis*, No. 11-cv-1752 (JRT/LIB), 2013 WL 3871429, at *4 (D. Minn. July 26, 2013) (holding that an arrest and handcuffing were not an unreasonable seizure because the officer "had probable cause to believe that [the plaintiff] had committed several minor criminal offenses").[5]

---

[5]    Cases from other jurisdictions reach this same conclusion. *See, e.g.*, *Demarest v. City of Vallejo*, 44 F.4th 1209, 1224–25 (9th Cir. 2022) (holding that § 1983 plaintiff's refusal to produce his license in response to officer's request gave officer probable cause to arrest plaintiff for violating the California Vehicle Code); *Hoover v. Walsh*, 682 F.3d 481, 499 (6th Cir. 2012) (holding that § 1983 plaintiff's failure to produce his license in response to officer's request gave officer probable cause to arrest plaintiff for violating a Michigan law requiring driver to provide license to officer on request); *Wos v. Sheahan*, 57 Fed. App'x 694, 696 (7th Cir. 2002) (holding that § 1983 plaintiff's failure to produce his license in response to officer's request gave officer probable cause to arrest plaintiff for violating Illinois law).

These arrest-related justifications aside, unique features of Mr. Rangel's refusal to comply with Officer Satele's demands for Mr. Rangel's driver's license and proof of insurance gave Officer Satele legitimate safety-related grounds to handcuff Mr. Rangel. Mr. Rangel's non-compliance was intentional. Nothing in the record shows or permits a different conclusion. There is, for example, no evidence showing or reasonably implying that Mr. Rangel did not hear or understand Officer Satele's requests. Mr. Rangel's non-compliance was persistent. Officer Satele asked Mr. Rangel for his license and proof of insurance several times, and Mr. Rangel refused each time. Mr. Rangel has identified no justification for his refusal to comply with Officer Satele's requests. Nor does he argue that Officer Satele's requests were improper. To be clear, Mr. Rangel had every right to express his view that the stop was racially motivated or improper for other reasons. He was nonetheless obligated to produce his license and proof of insurance in response to Officer Satele. Minn. Stat. §§ 171.08, 169.791, subdiv. 2(a). And the incident-specific characteristics of Mr. Rangel's refusal to comply—his willfulness, belligerence, and the absence of any excuse—gave Officer Satele reasonable grounds to be concerned regarding Mr. Rangel's willingness to cooperate, his possible intention to flee, and his interest in preventing the discovery of adverse information on his record, including perhaps outstanding warrants. These concerns in turn justified Officer Satele's decision to handcuff Mr. Rangel pending completion of the check on Mr. Rangel's identity and record.

If Officer Satele's handcuffing of Mr. Rangel violated the Fourth Amendment, Mr. Rangel has not shown that the right in question was clearly established. Mr. Rangel

advances two arguments to show that Officer Satele violated a clearly established Fourth Amendment right when he handcuffed Mr. Rangel, but neither argument is convincing. First, Mr. Rangel argues that the circumstances of his handcuffing are like the facts the Eighth Circuit addressed in *El-Ghazzawy*, 636 F.3d at 452.  ECF No. 28 at 11.  *El-Ghazzawy* involved a § 1983/Fourth Amendment claim, but that is where any similarity with this case ends.  In *El-Ghazzawy*, the defendant officer handcuffed and arrested the plaintiff on a theft-by-swindle charge after "fail[ing] to conduct even the most basic investigation into the facts" and though the plaintiff "exhibited no erratic or suspicious behavior prior to or during" his encounter with the officer and "was, by all accounts, calm and cooperative during the entirety of the incident." *Id.* at 457–58.  Here, by contrast, Mr. Rangel's persistent refusals to produce his license or proof of insurance may reasonably be characterized as suspicion-arousing and non-cooperative, and considering Mr. Rangel's behavior, Officer Satele's decision to handcuff Mr. Rangel was reasonably necessary to facilitate further investigation.  *El-Ghazzawy* does not "squarely govern" this case. *Kisela*, 584 U.S. at 105.

Second, Mr. Rangel argues that the general constitutional prohibition against excessive force obviously prohibited Officer Satele from handcuffing him.  ECF No. 28 at 6.  As support for this argument, Mr. Rangel cites two Eighth Amendment cases, *Nelson v. Correctional Medical Services*, 583 F.3d 522 (8th Cir. 2009) (en banc), and *Young v. Selk*, 508 F.3d 868 (8th Cir. 2007).  ECF No. 28 at 6–7.  It is difficult to understand how Eighth Amendment cases might show how Fourth Amendment excessive-force principles might apply with obvious clarity in any § 1983 case.

Regardless, accepting this argument would seem at odds with Supreme Court and Eighth Circuit guidance specific to Fourth Amendment cases. As the Eighth Circuit has explained,

> The right to be free from excessive force is, of course, well established. *Kukla* [*v. Hulm*], 310 F.3d [1046,] 1050 [(8th Cir. 2002)]. However, we cannot "define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Rather, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id.* (quotation omitted). "Such specificity is especially important in the Fourth Amendment context, where . . . [i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (quotation omitted) (alteration in original). In order for the right to be clearly established, "existing precedent must have placed the constitutional question beyond debate" so that "a reasonable official would understand that what he is doing violates that right." *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 989 (8th Cir. 2015) (quotations omitted).

*Ehlers v. City of Rapid City*, 846 F.3d 1002, 1012 (8th Cir. 2017). Consistent with these principles, the uniqueness of Officer Satele's encounter with Mr. Rangel makes this case a poor candidate for a qualified-immunity determination based on general Fourth Amendment principles.[6] Officer Satele is entitled to qualified immunity on Mr. Rangel's handcuffing-based Fourth Amendment excessive-force claim.

---

[6] Mr. Rangel did not attempt to present "a robust consensus of cases of persuasive authority," *De La Rosa v. White*, 852 F.3d at 745, involving sufficiently similar facts to squarely govern Officer Satele's actions. *See generally* ECF No. 28.

b

Cases support the high-level proposition that an officer may violate the Fourth Amendment's excessive-force prohibition by requiring a detainee to endure extreme temperatures. *See Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (holding that unnecessary exposure to extreme heat may amount to an Eighth Amendment violation); *Burchett v. Kiefer*, 310 F.3d 937, 945 (6th Cir. 2002) (reading *Hope* to imply that extreme heat exposure may violate the Fourth Amendment); *Punsky v. City of Portland*, 54 F.4th 62, 63–67 (1st Cir. 2022) (finding no constitutional violation where plaintiff kept in freezing temperatures but officers repeatedly offered to bring him clothing); *Miller v. Sanilac County*, 606 F.3d 240, 245, 251–52 (6th Cir. 2010) (affirming summary judgment to officer who made plaintiff perform sobriety tests in extreme cold where plaintiff never indicated that he needed medical help); *Sequeira v. McClain*, No. 15-cv-02587-PAB-MEH, 2017 WL 1197296, at *1–2, *7–8 (D. Colo. Mar. 31, 2017) (granting officer's motion to dismiss where plaintiff was held in nineteen-degree windchill for sixteen minutes and repeatedly complained that he was cold); *Johnson v. Ciesielski*, No. 1:10-cv-1453-LJM-DML, 2013 WL 139673, at *4 (S.D. Ind. Jan. 8, 2013) (finding no excessive force where plaintiff was "handcuffed in sub-freezing weather" for over an hour wearing a thin jacket and shorts, but lacked signs of hypothermia and did not complain about the cold); *Myles v. Laterzo*, No. 2:08-CV-202 TS, 2009 WL 1437574, at *5 (N.D. Ind. May 20, 2009) (dismissing unreasonable seizure claim where marshals transported plaintiff in his pajamas from his house to jail in freezing rain).

If these cases established the Fourth Amendment rule, it is difficult to see how Officer Satele's treatment of Mr. Rangel violated it. For his part, Officer Satele detained Mr. Rangel (while standing beside him) in extreme cold for a period of roughly five minutes before turning Mr. Rangel over to other officers. That is a very short period. It is true that the two other officers continued to detain Mr. Rangel outside for another roughly five minutes, but no record evidence shows that Officer Satele supervised or controlled the other officers or directed the other officers to keep Mr. Rangel outside, and Mr. Rangel did not sue those officers.

Regardless, Mr. Rangel has not met his burden of demonstrating that Officer Satele violated clearly established law by exposing him to the severe cold. Mr. Rangel argues that four Eighth Circuit cases squarely govern the cold-weather-exposure aspect of his Fourth Amendment claim. ECF No. 28 at 8–9 (first citing *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009); then citing *Seymour v. City of Des Moines*, 519 F.3d 790, 799–800 (8th Cir. 2008); then citing *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005); and then citing *S.S. v. McMullen*, 225 F.3d 960, 962 (8th Cir. 2000)). None of these cases addressed forced exposure to cold, heat, or other extreme weather. In *Brown*, an officer tased the plaintiff; the case involved no extreme-weather detention. *Brown*, 574 F.3d at 494–95. In *Seymour*, the plaintiff challenged the length of his detention while officers questioned him pursuant to a criminal investigation, but he was detained inside his home, not outdoors much less in extreme conditions. *Seymour*, 519 F.3d at 794. *Hart* and *McMullen* addressed Fourteenth Amendment claims, and neither involved cold weather or other extreme conditions. *Hart*, 432 F.3d at 803; *McMullen*,

225 F.3d at 962.  These cases do not "squarely govern" Mr. Rangel's excessive force claim.  Nor does Mr. Rangel present a robust consensus of persuasive authorities.  He cites one out-of-circuit case purporting to show that "placing the victim in harms [sic] way" amounts to a constitutional violation.  ECF No. 28 at 9 (citing *Riordan v. City of Joliet*, 3 F. Supp. 2d 889 (N.D. Ill. 1998)).  One case is not a robust consensus.  Regardless, *Riordan* addressed a Fourteenth Amendment substantive-due-process claim.  *See* 3 F. Supp. 2d at 893.  Finally, as the cases cited earlier demonstrate, answering whether forced cold-weather exposure might violate the Fourth Amendment requires a fact-intensive inquiry into things like the precise conditions, the duration of a detainee's exposure, any concerns the detainee may have expressed regarding the conditions, and any justifications the officer might have had for exposing the detainee to the conditions.  It is difficult, therefore, to envision how in this fact-intensive context a general Fourth Amendment principle might apply with obvious clarity to show a constitutional violation.  Officer Satele is entitled to qualified immunity on Mr. Rangel's cold-weather-based Fourth Amendment excessive-force claim.

2

Mr. Rangel claims that Officer Satele's deliberate indifference to Mr. Rangel's medical needs violated clearly established Eighth and Fourteenth Amendment rights.  Compl. ¶¶ 44–45.  On this case's facts, this claim must be brought and analyzed under the Fourteenth Amendment.  *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions."); *Smith-*

*Dandridge v. Geanolous*, 97 F.4th 569, 575 (8th Cir. 2024) (recognizing that "[a] pretrial detainee's deliberate indifference claim is governed by the Fourteenth Amendment").

The Fourteenth Amendment "extends to detainees at least the same protections that convicted prisoners receive under the Eighth Amendment." *Id.* (quoting *Perry v. Adams*, 993 F.3d 584, 587 (8th Cir. 2007)). As the Eighth Circuit explained in *Smith-Dandridge*,

> Deliberate indifference has two components: an objective component, which "requires a plaintiff to demonstrate an objectively serious medical need," and a subjective component, which "requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need." *Vaughn v. Gray*, 557 F.3d 904, 908 (2009) (citations omitted); *see also Dadd v. Anoka Cnty.*, 827 F.3d 749, 755 (8th Cir. 2016) ("A serious medical need is 'one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" (quoting *Vaughn v. Greene Cnty.*, 438 F.3d 845, 851 (8th Cir. 2006))); *Schaub v. VonWald*, 638 F.3d 905, 914–15 (8th Cir. 2011) ("Deliberate indifference is equivalent to criminal-law recklessness, which is 'more blameworthy than negligence,' yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate." (quoting *Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994))).

97 F.4th at 575–76. For the objective element's purposes, a serious medical need must be apparent when the defendant failed to address it. *Dantzler v. Baldwin*, --- F.4th ---, No. 23-3382, 2025 WL 1038045, at *10 (8th Cir. Apr. 8, 2025). For the subjective element, "[t]he requisite mental state may be established through circumstantial evidence, as 'a factfinder may determine that a defendant was actually aware of a serious medical need but deliberately disregarded it, from the very fact that the [medical need] was obvious.'" *Ryan v. Armstrong*, 850 F.3d 419, 425 (8th Cir. 2017) (quoting *Thompson v.*

*King*, 730 F.3d 742, 747 (8th Cir. 2013)). "Similarly, an obviously inadequate response may create 'an inference that the officer recognized the inappropriateness of his conduct.'" *Id.* (quoting *Thompson*, 730 F.3d at 747).

Here, the plaintiff-friendly reading of the record does not show either element. Again, after detaining Mr. Rangel, Officer Satele stood next to Mr. Rangel for roughly five minutes before giving his custody over to Officers Groth and Lindberg. No evidence shows that Mr. Rangel was displaying obvious or easily-recognizable frostbite symptoms during the five-minute period he was with Officer Satele. It is true that Mr. Rangel complained of the cold (as did Officer Satele), asked for gloves, and was shivering, but these are everyday cold-weather responses. Mr. Rangel did not complain to Officer Satele of pain, numbness, discoloration, or other symptoms indicative of frostbite or the need for a doctor's attention. *See Frostbite*, Mayo Clinic, https://www.mayoclinic.org/ diseases-conditions/frostbite/symptoms-causes/syc-20372656 (last visited Apr. 23, 2025) (listing frostbite symptoms). No evidence reasonably justifies a finding that Mr. Rangel's typical cold-weather reactions indicated he was then suffering—or was obviously at imminent risk of suffering—frostbite. In other words, nothing suggests Mr. Rangel's condition or behavior was enough so that "even a layperson would recognize the necessity for a doctor's attention" at that time.[7] *Vaughn*, 438 F.3d at 851 (quotation

---

[7]    Without more, a plaintiff's own complaints of pain do not ordinarily give a layperson reason to recognize the need for a doctor's attention. *See Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (holding that the plaintiff's self-report of tooth pain, unaccompanied by "outward signs of injury, such as bleeding and swelling, that a layperson would recognize" did not constitute a serious medical need); *see also Hancock*

omitted).  As with his Fourth Amendment claims, Mr. Rangel identifies no reason to hold Officer Satele responsible for the period Mr. Rangel was in Officers Groth and Lindberg's custody.  The evidence shows that Officer Satele was in his squad car investigating Mr. Rangel's license during that time.  He was not paying close attention to Mr. Rangel's condition, and no evidence shows Officer Satele was positioned to detect whether Mr. Rangel was suffering frostbite or frostbite-related symptoms.  During the brief period Officer Satele was back with Mr. Rangel at the stop's conclusion (when he handed Mr. Rangel the written warning), Mr. Rangel gave no indication he was suffering from an objectively serious medical need. During that period, Mr. Rangel remained for roughly one minute to protest Officer Satele's justification for the stop before returning to the truck to leave.  Mr. Rangel did not say he required medical attention; he said nothing to indicate he was suffering from frostbite or frostbite-indicative symptoms.

If Mr. Rangel showed an objectively serious medical need, he has not shown Officer Satele's deliberate indifference.  Officer Satele knew it was very cold and that Mr. Rangel was very cold.  But Officer Satele also testified that he did not observe Mr. Rangel suffer frostbite symptoms and that, although he was unaware how quickly frostbite developed, he knew Mr. Rangel's outdoor detention would be relatively brief. No evidence undermines this unrebutted testimony.  As just discussed, Mr. Rangel's medical need was not obvious.  *Ryan*, 850 F.3d at 425.

---

*v. Arnott*, 39 F.4th 482, 487 (8th Cir. 2022) ("Without corroborating evidence of symptoms, however, self-reported assertions of pain are insufficient to survive summary judgment.").

Mr. Rangel argues that his "situation is very similar to *Gordon v. Faber*," 973 F.2d 686 (8th Cir. 1992), "where the Eighth Circuit upheld an Eighth Amendment violation where inmates were left outside in subzero temperature with only jackets, but no hat or gloves." ECF No. 28 at 16. This comparison is inapt. *Gordon* was a conditions-of-confinement case, not a deliberate-indifference-to-medical-needs case. In *Gordon*, the district court held that the defendant security officer's actions in denying the inmates weather-appropriate clothing amounted to cruel and unusual punishment because they lacked any penological justification. *Gordon v. Faber*, 800 F. Supp. 797, 799–800 (N.D. Iowa 1992). As the district court explained, "adequate clothing is one of the necessities of life of which prison officials cannot deprive an inmate," and "the actions taken by the defendant against the plaintiffs were totally unjustified and amounted to the intentional infliction of pain." *Id.* at 800. A close examination of the district court's opinion shows the court did not analyze a deliberate-indifference claim. *See generally id.* Though the Eighth Circuit described medical consequences resulting from the defendant's behavior (and the behavior of other prison officials), it affirmed based on the district court's analysis, 973 F.2d at 688, and did not analyze a deliberate-indifference claim, either, *see generally id.* Officer Satele is entitled to qualified immunity on Mr. Rangel's Fourteenth Amendment deliberate-indifference claim.[8]

---

[8]    In his opposition brief, Mr. Rangel argued that Officer Satele violated his Fourteenth Amendment due process rights based on a state-created danger theory. ECF No. 28 at 11–13. This theory is not pleaded in Mr. Rangel's Complaint, meaning it would be inappropriate to consider it at this stage. *See Spengler v. Worthington*

3

"'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Id.* (quoting *Hartman*, 547 U.S. at 256). Thus, to overcome qualified immunity in the context of an allegedly retaliatory arrest or detention, the plaintiff must show the lack of arguable probable cause (in the case of an arrest) or arguable reasonable suspicion (in the case of a *Terry* stop). *See id.* at 402; *Watson v. Boyd*, 2 F.4th 1106, 1113 (8th Cir. 2021); *Waters v. Madson*, 921 F.3d 725, 741–42 (8th Cir. 2019); *see also Hylton v. District of Columbia*, No. 21-cv-2673 (JMC), 2025 WL 740454, at *9–10 (D.D.C. Mar. 7, 2025). These rules, paired with the earlier determination that Officer Satele's detention of Mr. Rangel was supported by at least arguable reasonable suspicion, warrant the entry of summary judgment against Mr. Rangel's First Amendment retaliation claim.[9]

---

*Cylinders*, 514 F. Supp. 2d 1011, 1017 (S.D. Ohio 2007) ("[A] plaintiff may not defeat summary judgment by asserting a claim that he did not plead in the complaint.").

[9]    Mr. Rangel presented no "objective evidence that he was [detained] when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 587 U.S. at 407.

V

In Minnesota, a negligence claim has four elements: "(1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) the breach of the duty being the proximate cause of the injury." *Gradjelick v. Hance*, 646 N.W.2d 225, 230 (Minn. 2002) (citation omitted)). Officer Satele argues that he—and by extension, the City—possesses official immunity as a matter of law in response to Mr. Rangel's negligence claim, but not outright. Officer Satele and the City seek summary judgment on this ground to the extent the negligence claim challenges Mr. Rangel's removal from the truck and handcuffing. ECF No. 24 at 22–23. Officer Satele and the City do not seek summary judgment with respect to Mr. Rangel's cold-weather injuries. *Id.* at 3 n.3.

"As distinguished from the 'qualified immunity' afforded peace officers when addressing 42 U.S.C. § 1983 claims, under Minnesota law a public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion." *Heard v. City of Red Wing*, 393 F. Supp. 3d 785, 792 (D. Minn. 2019) (quoting *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990)); *accord Ward v. Olson*, 939 F. Supp. 2d 956, 964 (D. Minn. 2013) (quoting *Dokman v. County of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001)). If an official's actions require the exercise of discretion, he is entitled to official immunity "unless the official committed a willful or malicious wrong." *Heard*, 393 F. Supp. 3d at 792 (citing *Pletan v. Gaines*, 494 N.W.2d 38, 40 (Minn. 1992)).

Cases establish that Officer Satele's actions in detaining Mr. Rangel were discretionary for qualified immunity purposes. "Generally, police officers are classified

as discretionary officers entitled to [official] immunity." *Olson*, 939 F. Supp. 2d at 964 (quoting *Morris*, 453 N.W.2d at 42); *see also Yang v. City of Brooklyn Park*, 194 F. Supp. 3d 865, 874 (D. Minn. 2016) ("Under Minnesota law, official immunity protects police officers engaged in law enforcement efforts unless they act with subjective malice." (quoting *Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir. 2006))).

In answering whether an officer acted willfully or maliciously, "courts consider whether the official has intentionally committed an act that he or she had reason to believe is prohibited. This contemplates less of a subjective inquiry into malice, which was traditionally favored at common law, and more of an objective inquiry into the legal reasonableness of an official's actions." *Heard*, 393 F. Supp. 3d at 792 (cleaned up) (quoting *Hassan v. City of Minneapolis*, 489 F.3d 914, 920 (8th Cir. 2007)); *see also Brown*, 574 F.3d at 500–01 ("In the context of official immunity, 'willful' and 'malicious' are synonymous, and the Minnesota Supreme Court has defined malice as 'nothing more than the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right.'" (quoting *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991))). The malicious-wrong exception to official immunity "anticipates liability only when an official intentionally commits an act that he or she then has reason to believe is prohibited." *Rico*, 472 N.W.2d at 107. "The determination of whether an officer acted maliciously or willfully is usually a question of fact for the jury." *Olson*, 939 F. Supp. 2d at 964 (citing *Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn. 1988)).

Officer Satele is entitled to official immunity—and the City is entitled to vicarious official immunity—for removing Mr. Rangel from his truck and handcuffing him. This conclusion follows from the earlier conclusion that Officer Satele had probable cause to arrest Mr. Rangel or, alternatively, at least arguable reasonable suspicion to detain him. To the extent it concerns his removal from the truck and handcuffing, Mr. Rangel's negligence cause of action seems to depend on the claim that Officer Satele violated the Fourth Amendment's excessive-force prohibition—that is, the Fourth Amendment established the duty and the officer's use of excessive force allegedly breached it. If there is another source of the duty, Mr. Rangel has not identified it. In this situation, there is no daylight between the determination that Officer Satele possesses qualified immunity against Mr. Rangel's Fourth Amendment excessive-force claim and his entitlement to official immunity under Minnesota law for his actions in removing Mr. Rangel from the truck and handcuffing him.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendants' Partial Motion for Summary Judgment [ECF No. 22] is **GRANTED**.

Dated:  April 23, 2025                                  s/ Eric C. Tostrud
                                                        Eric C. Tostrud
                                                        United States District Court